**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:06cv399**

| | | |
|---|---|---|
| **DORIS N. ANDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF DECISION** |
| | ) | |
| **DUKE ENERGY CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for

Summary Judgment [Doc. 21], and the Plaintiff's Request for Indigence

[Doc. 30]. For the reasons stated herein, the Motion for Summary

Judgment is granted, and the Plaintiff's Motion is denied.

**PROCEDURAL HISTORY**

The Plaintiff, who appears *pro se*, initiated this action in state court

on August 25, 2006 alleging she was terminated from her employment

based on racial discrimination and stating claims pursuant to North

Carolina public policy as expressed in N.C.Gen.Stat. §143-422.2, Title VII

1

of the Civil Rights Act of 1964, and 42 U.S.C. §1981. [Doc. 1]. On September 21, 2006, the Defendant removed the action to this court based on federal question jurisdiction. [Id.]. On that same date, the Defendant filed its Answer to the Complaint. [Doc. 3]. The parties' mediation was unsuccessful. [Doc. 20].

On October 12, 2007, in accordance with the deadlines established by the Pre-Trial Order and Case Management Plan, the Defendant filed the pending Motion for Summary Judgment. [Doc. 21]. The Plaintiff moved for an extension of time within which to respond to the Motion for Summary Judgment. [Doc. 25]. That motion was granted and the Plaintiff was provided notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), of the burden she faced in responding to a Motion for Summary Judgment. [Doc. 26]. In response, the Plaintiff filed a document which she captioned, "Unsworn Statement Submitted." [Doc. 27].

Thereafter, the Plaintiff requested a second extension of time within which to respond to the motion. [Doc. 28]. That motion was also allowed, and the time for the Plaintiff to respond was extended to November 28, 2007. [Doc. 29]. On that date, the Plaintiff filed three responses: (1) Document 31, titled Response to Defendant's Motion for Summary Judgment, which was signed by the Plaintiff; (2) Document 32, titled

Responses to Brief in Support of Defendant's Motion for Summary Judgment, which was signed by the Plaintiff; and (3) Document 33, titled Responses to Declaration of Vicki F. Thompson, which was not signed by the Plaintiff. The documents that are signed by the Plaintiff are not under oath or under penalty of perjury, and therefore cannot be considered as evidence, but only as argument. To the extent that they are intended as argument, however, none of them contain a single citation to legal authority or citations to the evidentiary record.

On November 20, 2007, the Plaintiff also moved to have her portion of the mediation fee waived. [Doc. 30]. The Defendant filed a response to the motion. [Doc. 35].

## STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir.

2003) (emphasis in original).  A genuine issue exists if a reasonable jury

considering the evidence could return a verdict for the nonmoving party.

Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), *citing* Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

"Regardless of whether he may ultimately be responsible for proof and

persuasion, the party seeking summary judgment bears an initial burden of

demonstrating the absence of a genuine issue of material fact."  Bouchat,

346 F.3d at 522, *citing* Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106

S.Ct. 2548, 2553 (1986).  If this showing is made, the burden then shifts to

the non-moving party who must convince the Court that a triable issue does

exist. [Id.].

> A party opposing a properly supported motion for summary
> judgment "may not rest upon the mere allegations or denial of [his]
> pleadings," but rather must "set forth specific facts showing that
> there is a genuine issue for trial."  Furthermore, neither
> "[u]nsupported speculation," nor evidence that is "merely
> colorable" or "not significantly probative," will suffice to defeat a
> motion for summary judgment; rather, if the adverse party fails to
> bring forth facts showing that "reasonable minds could differ" on
> a material point, then, regardless of "[a]ny proof or evidentiary
> requirements imposed by the substantive law," "summary
> judgment, if appropriate, shall be entered."

[Id.].

Nonetheless, in considering the facts for the purposes of this motion,

the Court will view the pleadings and material presented in the light most

favorable to the nonmoving party. <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986).

## UNDISPUTED FACTS

The Plaintiff Doris Anderson (Anderson), who is an African American female, began working at Duke Power Company (Duke) in September 1976 as a full-time clerk/typist. [Doc. 24-2 at 38-40].  She remained in this position until March 1983 when she was granted a little more than one year of maternity leave. [<u>Id</u>.].  While on leave, Anderson remained a Duke employee. [<u>Id</u>.].  After her leave ended in May 1984, she was again employed full-time as a clerk/typist. [<u>Id</u>.].  In 1984, Anderson was promoted to the position of office assistant. [<u>Id</u>. at 41].  In 1992, the group at which she was working was moved to the general offices of Duke in Charlotte. [<u>Id</u>. at 43].  At some point, her title changed to administrative specialist but the change in title was not a promotion. [<u>Id</u>. at 44].  Anderson was terminated from her employment with Duke on January 12, 2006. [Doc. 23-2 at ¶9].

As an administrative specialist, Anderson was an hourly employee. [Doc. 23-8 at ¶4].

> Each administrative specialist was responsible for preparing his or her own written timesheets accurately recording the hours worked for each biweekly pay period, and submitting the timesheets to the

primary timekeeper for the work group, who at that time was Mark Amiel. After I reviewed and signed off on the timesheets for each pay period, Mr. Amiel entered the time into the Company's computerized Corporate Time Reporting ("CTR") system.

[Id.].

Anderson received annual performance reviews while she was employed at Duke. [Doc.24-2 at 48]. In February 2000, she received an annual review with which she did not agree and therefore, she refused to sign the performance evaluation. [Id. at 55-57]. ("I do not agree with most of evaluation, therefore, I rather not sign."). She did not agree that she needed to learn at her job "on the fly" or that she had difficulty working with others. [Id. at 57].

Anderson received an annual performance review in March 2001. [Id. at 61]. In July 2001, Anderson's supervisor had a conversation with her about the importance of notifying him if she was going to be late or absent from work. [Id. at 67-68]. In September 2001, she received a corrective action notice from Duke which specified the following inappropriate work conduct:

Doris scheduled vacation for Monday and Tuesday, September 10 and 11. She did not report back to work until lunch on Monday, September 17. She did not notify her manager of her absence. Not informing management of taking time off is not acceptable.

[Id. at 65, 67].

Anderson's response to that corrective action was as follows:

> I have called Mark concerning my being off. At this time, I was in a mental state of being concerned about what happened on 9/11/01. If Mark can't understand that, then there's no hope for him or this company. Give me a company car and I will not be late.

[Id. at 69].

In February 2002, Anderson received her annual performance review from her then supervisor, Mark Johnson. [Id. at 72]. Under the section for employee comments, Anderson wrote, "I am so tired of these APA's [annual performance appraisals]. Damn shame you're judged by man, no justice." [Id. at 73].

In March 2002, Anderson received another written notice of corrective action. [Id. at 77]. The notice contained a description of inappropriate work behavior as the "[f]ailure to follow proper time reporting procedures." [Doc. 24-3 at 78]. "Issues include: Inability to produce signed timesheets for herself for 12 weeks in 2001." [Id. at 79]. Anderson agreed that she had failed to produce some timesheets. [Id.]. Anderson was also accused of entering unsigned timesheets; that is, timesheets that had not been approved by her supervisor, an accusation with which she agreed. [Id. at 80]. In addition, Anderson took more vacation than she was entitled to during 2001. [Id. at 82]. Anderson refused to sign the corrective action

notice. [Id. at 82-3].

In January 2003, Anderson received another corrective action notice. [Id. at 103]. At this point, her supervisor was Vicki Jackson-Robertson and the action was taken due to Anderson's "failure to follow instructions." [Id. at 104]. Anderson was told that she could have been terminated for the conduct but was going to be given another opportunity. [Id. at 105]. Again, Anderson refused to sign the notice. [Id.].

By February 2004, Anderson was being supervised by Roger Hagy. [Id. at 115]. In March 2005, Vicki Thompson, a Caucasian female, replaced Hagy as Anderson's supervisor. [Id. at 124, 133]. On March 9, 2005, Anderson began leave under the Family Medical Leave Act (FMLA) after foot surgery. [Id. at 126]. Anderson's original date to return to work was to be March 25, 2005. [Id. at 127]. Although Anderson recalls that she notified the FMLA administrator that she was not returning to work as originally scheduled, she did not notify her supervisor, Thompson. [Id.]. At the end of March 2005, Anderson gave Thompson a physician's note advising she would be able to return to work on April 18, 2005. [Id. at 129]. Anderson did not return on that date either, but did ask Thompson to approve vacation time for May 18 through 23, 2005. [Id.]. She returned to work on May 24, 2005. [Id.].

When Anderson returned from her medical leave, she asked if her work schedule could be changed from an 8:00 a.m. to 4:30 p.m. shift to a 7:00 a.m. to 3:00 p.m. shift with no lunch break. [Id. at 134]. Thompson checked with Human Resources and responded that it was against company policy to allow a work schedule which did not include a lunch break. [Id.]. A new schedule of 7:00 a.m. to 3:30 p.m. with a thirty minute lunch break was, however, approved. [Id.]. This remained Anderson's work schedule for the remainder of her employment with Duke. Id. at 135].

When Anderson returned from medical leave, she had a meeting with Thompson on May 25, 2005. [Id. at 137]. Thompson told Anderson during that meeting that she needed to notify Thompson ahead of time if she was going to be late or absent from work and Anderson was also to record all anticipated time away from work on her Lotus Notes calendar. [Id.]. On the morning of May 26, 2005, the day after having returned from leave, Anderson sent an email to Thompson stating she was going to take as vacation one-half of the day of May 26, 2005, (i.e. the day of the notice), and May 27, May 31 and June 1. [Id. at 150-51]. Anderson did not speak directly with Thompson prior to leaving for vacation. [Id.]. She also did not receive an email response from Thompson prior to leaving for vacation. [Id.]. When Anderson returned from vacation, Thompson had a meeting

with her on June 3, 2005 during which Anderson was given a copy of the company's written attendance and absences policy. [Doc. 24-4 at 152]. Thompson reiterated that Anderson needed to obtain her prior approval before leaving for vacation. [Id.].

On August 10, 2005, Anderson never reported for work at all on that date and did not call Thompson to advise that she would not report to work that day. [Id.]. Anderson also did not record this as a vacation day on her calendar. [Id. at 155]. On August 11, 2005, Anderson sent Thompson the following email: "I was in court all day yesterday. I thought it would only take a few hours. I would like to make up the hours this weekend." [Id.]. During her deposition, Anderson testified as follows:

> Q. Were you actually in court on August 10, 2005?
> A. If I said I was, I was.
>
> ...
>
> Q. Did you have jury duty?
> A. I'll get back to you on that one.
> Q. Well, this is your time to answer the question. You won't be able to get back to me after today. Do you recall why you were in court on August 10, 2005?
> A. I wasn't in court.

[Id. at 156]. In actuality, Anderson was not in court herself but went to court with a friend of hers for moral support. [Id.]. She admitted at her deposition that she should not have done so. [Id.].

This incident resulted in another directive from Thompson telling

Anderson that she needed to call if she was not going to report to work and Anderson was asked to clarify that her home and contact telephone numbers had not changed. [Id. at 157]. Anderson responded by email that she would call in the future and that her numbers had not changed. [Id.].

On November 18, 2005, Anderson sent an email to Thompson stating that she would like to take off half of the day of November 21, 2005. [Id. at 170]. Thompson approved this request and asked Anderson to please update her calendar with that information. [Id.]. Although Anderson was scheduled to take off between 7:00 a.m. and 11:00 a.m. on November 21, 2005, Anderson testified that she actually reported to work around 7:20 a.m. on the morning of November 21, 2005 and stayed until about 10:30 a.m. [Id. at 171]. Thompson called Anderson's mother that same morning looking for her but Anderson did not return the call until around 8:00 p.m. that evening. [Id. at 172]. Anderson tape recorded that phone conversation without the permission of Thompson. [Id.]. During that conversation, Thompson asked if Anderson was alright because she had not been at work that day. [Id. at 177]. Anderson told Thompson that she had been at work but was in the bathroom because she was sick with diarrhea. [Id.]. Thompson, however, pointed out that she had gone to Anderson's office and it was clear that she was not there because her computer and light

were not turned on. [Id. at 178].  Anderson insisted that she had arrived around 7:20 a.m. but was in the bathroom. [Id.].  Thompson told her that if she was going to arrive at work late, she should have called. [Id.].  Thompson also told Anderson that if she had been sick, she should have stayed at home and used her sick leave. [Id. at 179].  But Anderson responded that she had not wanted to use her sick leave. [Id.].  Thompson advised Anderson during that phone conversation that she had sent an email on Friday and again on the morning on November 21 and left a phone message but Anderson failed to respond to any of those attempts at contact. [Id. at 180].  Thompson reiterated that if Anderson was not coming into work or was going to be late, she had to call. [Id. at 181].

On November 22, 2005, Anderson called Thompson to say she would be at work around 9:30 a.m. [Id.].  This call was made after 7:00 a.m. [Id. at 182].

On December 28, 2005, Thompson asked Anderson to meet with her and Marty Wright, a manager with Duke. [Id. at 190].  During that meeting, Thompson reviewed with Anderson her failure to report to work on November 21, 2005. [Id. at 192].  Thompson advised that from Anderson's calendar, she could not ascertain whether Anderson had intended to take off the morning or the afternoon and Anderson failed to report to work at all.

[Id.].  Moreover, Thompson had been unable to contact Anderson throughout the work day. [Id.].  Thompson advised Anderson that because the explanation given did not comport with her observations, Thompson investigated when Anderson came into the building on that date. [Id. at 193].  In 2005, workers entered Duke by swiping their security badges or signing a visitor's pass book. [Doc. 24-3 at 120-121].  Duke kept electronic logs which showed when each employee used his or her badge to enter the facility. [Id.].  Thompson told Anderson that the records showed she had not entered the building at all on November 21, 2005. [Doc. 24-4 at 193].  Thompson also advised Anderson that as a result of that information, Thompson had compared the times Anderson reported on her timesheets with the records of when she actually entered the building on other occasions. [Id. at 194].  Thompson told  Anderson, "So what I have found is that on several occasions just over several weeks, you were not at work, but you told me you were and your timesheets indicated that you were here working." [Id. at 195].  One of the dates mentioned by Thompson was Tuesday, November 8, 2005. [Id. at 196].  Building records showed that Anderson did not enter the building at all on that date but Anderson's timesheet showed she had worked eight hours. [Id.].  Thompson also mentioned two other days, November 14 and 15, 2005 when Anderson's

timesheets showed she worked eight hours but there was no record that Anderson ever entered the building. [Id.]. Likewise, on December 16, 2005, Anderson's timesheets did not comport with time spent in the building. [Id. at 197]. As a result, Thompson told Anderson that she would be removed from service pending an investigation. [Id. at 198].

During the investigation, it was learned that between November 2, 2005 and December 16, 2005, there were fifteen separate instances in which Anderson falsified her timesheets resulting in a total of over seventy-five hours of falsified time for which Anderson was compensated. [Doc. 23-4 at 32-37].

On January 12, 2006, Anderson met with Thompson and two other Duke employees to discuss the outcome of the investigation. [Doc. 24-5 at 208]. Anderson was given a corrective action notice during the meeting which showed that she was being terminated for falsification of timesheets. [Id. at 208-09]. Thompson told Anderson as well that she was being terminated for violation of company policies and procedures and for falsifying timesheets. Id. Anderson refused to sign the notice. [Id.].

Anderson filed a request for recourse after the termination. [Id.]. In her recourse letter she complained about "mental harassment" during her tenure at Duke. [Doc. 24-7 at 21-38]. There is no allegation or claim in the

letter, however, referring to her race, age or discrimination. [Id.]. In February 2006, Anderson was advised that the recourse process affirmed the decision of management to terminate her position at Duke. [Doc. 24-5 at 223]. In fact, the letter was sent to Anderson from Ruth Shaw, the Chief Executive Officer of Duke. [Doc. 24-8 at 27]. Shaw wrote that:

> In your letter of recourse, you brought up allegations of harassment. Through the investigation that was conducted, we were not able to substantiate any of those allegations.
>
> As our records indicated *and you confirmed in your interview*, you had accounted for time worked on your timesheet when you were not in the office. These actions led to your termination.

[Id. (emphasis provided), Doc. 23-4 at 28]. (Anderson admitted during the internal recourse investigation that she had most likely put time on her timesheets when she did not work.)

On May 8, 2006, Anderson filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). [Doc. 24-8 at 28]. In that charge, Anderson limited her allegations of discrimination to the time period between December 28, 2005 through January 12, 2006. [Id.]. Anderson's reported discrimination was described as follows: "I was told by Vicki Thompson that I was terminated for falsification of timesheets. *I was*

*reprimanded in 2002 and 2003 for similar reasons.*"[1] [Id. (emphasis provided)]. The allegations made by Anderson in this action pertaining to an earlier time period, however, were not included in the EEOC charge.[2]

Anderson stated she did not know if Duke hired a replacement for her position of administrative specialist. [Doc. 24-5 at 215]. Thompson testified that Duke did not replace Anderson but distributed her job duties among other personnel. [Doc. 23-8 at ¶43].

In response to the Motion for Summary Judgment, the Plaintiff filed three documents, one of which was unsigned, and a statement which reads as follows: "I, *pro se* Plaintiff, Doris N. Anderson, declare under penalty of perjury, that Plaintiff has evidence to offer to show that this is a genuine issue for trial. This statement is true." [Doc. 27]. By means of the Roseboro order sent to the Plaintiff, she was specifically advised that it was necessary to submit evidence in the form of an affidavit under oath or a declaration made subject to penalty of perjury. Anderson relied on the

---

[1]In February 2003, Anderson wrote a letter of recourse after receiving a corrective action notice. [Doc. 24-6 at 11-29]. That letter shows that she was reprimanded at that time for inaccurate timesheets, as well as other performance issues. [Id.]. Likewise, in this letter, Anderson did not make any allegations related to race, age or discrimination. [Id.].

[2]To the extent that allegations in this cause of action exceed the scope of the EEOC charge, either as to time or alleged acts of discrimination, the allegations must be dismissed. Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996).

general allegations in her Complaint and in the two responses which were not made under oath or penalties of perjury. A third response was not signed at all but had multiple unauthenticated documents attached. Thus, she did not comply with the directive contained within the <u>Roseboro</u> order. The Court cannot consider inadmissible evidence in opposition to the Motion for Summary Judgment. Fed.R.Civ.P. 56.

Anderson alleged in her Complaint that her last supervisor, Vicki Thompson, failed to provide her with a six month evaluation during her last year of employment with Duke. [Doc. 1-2 at ¶12]. During her deposition, Anderson testified that one prior supervisor, Roger Hagy, had given her a six month evaluation and that it was possible that Mark Johnson had done so. [Doc. 24-5 at 221]. Anderson acknowledged that it was not Thompson's custom to perform six month evaluations and that she did not believe she had produced documentation of any six month review during the course of her employment. [<u>Id</u>. at 221-22].

Thompson has testified that during her experience as a supervisor at Duke, it had not been the custom or practice to provide six month or mid-year performance evaluations. [Doc. 23-8 at ¶42]. Thompson further stated that she did not provide such evaluations to any of the employees under her supervision, including Anderson, and that Anderson did not at any time

request such an evaluation. [Id.].  It does bear noting, however, that Thompson had more than one meeting with Anderson during 2005 concerning Anderson's performance.  Although such meetings may not have been designated as performance evaluations, it would be impossible for an employee not to have realized that Thompson was discussing performance issues with Anderson.

Anderson alleged in her Complaint that a similarly situated white male failed to report that he would be absent from work and no adverse action was taken against him. [Doc. 1-2 at ¶9].  In her various responses, Anderson claims that three financial executives at Duke falsified their accounting in order to show compliance with regulations but were not terminated.  In response to the Motion for Summary Judgment, Anderson has not presented any evidence concerning these individuals, such as their identities, job positions, and/or when such an incident or incidents may have occurred.

During her deposition, Anderson made an allegation that at some point in 1999 she overheard an unidentified male make a derogatory remark about African Americans and the use of guns. [Doc. 24-5 at 239].  In response to a comment from another unidentified person, that individual stated "Well, we don't have to worry about that in our race." [Id.].  From this

comment, Anderson concluded the individual thought African Americans were more likely to shoot each other. [Id.]. She did not know the person, did not see him and could not identify him but she believed he was Caucasian. [Id. at 239-40]. Other than that incident, no one at Duke ever made a derogatory remark to her about her race. [Id.]

In her Complaint and some of the responses, Anderson alleged that Thompson refused to allow her to work overtime. The record shows that when Anderson had an unexcused absence from work on August 10, 2005, she asked if she could make the day up by working on the weekend. [Doc. 24-4 at 157]. Thompson responded that she could not approve making up the time on the weekend. [Id.]. Anderson also admitted that overtime work during 2005 required prior approval from a supervisor. [Id. at 158]. Thompson has testified that "No administrative specialists under my supervision were permitted to work on weekends, either to makeup missed time or work overtime hours. This was the only occasion on which Ms. Anderson asked me for permission to make up time on weekends. To my recollection, Ms. Anderson never asked me for permission to work overtime hours." [Doc. 23-8 at ¶11].

Anderson has alleged that her supervisors thought it was insubordinate for a black woman to ask for a new scanner to use in her job.

19

Evidence submitted by Duke shows that Anderson complained about a scanner provided to her to scan drawings. [Doc. 24-7 at 10-14]. The response to her was that she would need to be able to justify the additional expense of purchasing a different scanner by providing information about the amount of scanning she did in an average week. [Id. at 13]. Anderson replied that she did approximately 15 to 20 such assignments per week. [Id.]. Management made a decision not to purchase a new scanner solely for Anderson and explained as follows:

> The Vidar scanner that Doris uses is about 12 years old. ... This software will not run on Win 2000 or XP. We can make it work but Doris would have to follow several steps each time she rebooted the workstation and she did not seem to want to do that. Therefore we just kept the Win 98 workstation to run the scanner.
>
> There is a much better scanner on the 8th floor that she can use. There is also a scanner on the 4th floor that she can use. To replace that scanner will cost between $10k to $25k depending on speed and features. The one o[n] the 8th floor was $22k.

[Id. at 10].

Thompson testified in her affidavit that Anderson was the only employee in the department who had a separate scanner located in his or her work area designated primarily for his or her individual use. [Doc. 23-8 at ¶14]. All other employees shared scanners that were located in common areas. [Id.].

Anderson made other general allegations as follows: (1) she may not

20

be able to prove that Duke terminated her because of her race but it played a factor; (2) the individuals who made the decision to terminate her were all white; (3) she was terminated because she is "a strong Black woman that has always stood her ground at Duke Energy;" (4) Thompson as a white female had a personal vendetta against Anderson and lied about her performance; (5) Anderson performed her job well and had received good evaluations in prior years; (6) no one ever complained to her about falsifying work records; and (7) if Anderson's timesheets were inaccurate, it was Thompson's job to notice and bring it to Anderson's attention.

## DISCUSSION

Anderson has alleged that she was terminated from her employment because of her race and has asserted claims pursuant to Title VII, 42 U.S.C. §1981 and North Carolina public policy.  "The elements of a claim under §1981 [] mirror those of Title VII:  A plaintiff must provide direct evidence of discriminatory treatment or proceed under the framework set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), to establish a *prima facie* case."  McCray v. Pee Dee Regional Transp. Authority, 2008 WL 343014 **4 (4th Cir. 2008); *accord*, Holland v. Washington Homes, Inc., 487 F.3d 208 at 213-14 (4th Cir. 2007), *cert. den.*

128 S.Ct. 955 (2008).

Anderson has made general allegations that a similarly situated white male was absent from work without permission but was not disciplined. She also made claims that three financial executives engaged in fraudulent accounting but were not terminated. She has not, however, placed any admissible evidence before the Court regarding these allegations. Her statements are rank hearsay. Evans v. Techs. Applications & Serv. Co., 80 F.3d at 954, 962 (4th Cir. 1996) (summary judgment affidavits cannot be conclusory or based on hearsay). Anderson's argument that she was fired for being "a Strong black woman" by supervisors who were all white is nothing more than speculation and does not rise to the level of direct or circumstantial evidence. Ennis v. Nat'l Ass'n of Bus. And Educ. Radio, Inc., 53 F.3d at 55, 62 (4th Cir. 1995). ("Mere unsupported speculation is not enough to defeat a summary judgment motion."). Anderson also claims she performed well but Thompson lied about her falsification of timesheets as a means of carrying out a personal vendetta against Anderson. These claims, however, are "merely [] self-serving opinion[s] that cannot, absent objective corroboration, defeat summary judgment." Williams v. Giant Food, Inc., 370 F.3d at 423, 433 (4th Cir. 2004). She must support such claims with evidence, which she has not done. Likewise, Anderson's claims

that she was denied a six month evaluation, overtime work and a new scanner can be taken as true, but there is no objective evidence in the record which corroborates her perception that this was at all related to her race. Ennis, 53 F.3d at 62. ("The building of one inference upon another will not create a genuine issue of material fact."); Bryant v. Bell Atl. Md., Inc., 288 F.3d at 124, 134-35 (4th Cir. 2002) ("These affidavits ... amount to no more than subjective beliefs, and such evidence, without more, is insufficient to create a genuine issue of material fact as to any discriminatory conduct on Bell Atlantic's part."). In fact, the record shows that Duke went to great extremes to accommodate Anderson. For example, Anderson was granted a maternity leave for more than a full year. When she was out on FMLA leave, she was allowed to return well after her FMLA time had run out, and once her leave expired, she was allowed to take vacation back to back with her medical leave. When she returned, she asked for a different work schedule, which request was granted. The record of her performance evaluations shows a persistent pattern of tardiness and absenteeism as well as a cheeky attitude reduced to writing, such as the comment, "Give me a company car and I won't be late." [Doc. 24-2 at 69]. Despite years of performance issues, Duke did not terminate Anderson until it was learned that she had falsified time sheets. "At bottom,

23

[Anderson] imputes to [Duke] discriminatory motive, without factual

support." Ennis 53 F.3d at 62.

Anderson has not produced, in response to the Motion for Summary

Judgment, any direct or circumstantial evidence of race discrimination.[3]

Laber v. Harvey, 438 F.3d at 404, 430 (4th Cir. 2006). As a result, she must

proceed under the *McDonnell-Douglas* framework. [Id.].

> Under the *McDonnell-Douglas* pretext framework, an employee
> demonstrates a *prima facie* case of race discrimination by showing
> that (1) [s]he is a member of a protected class; (2) [s]he suffered
> adverse employment action; (3) [s]he was performing [her] job
> duties at a level that met [her] employer's legitimate expectations
> at the time of the adverse employment action; and (4) the position
> remained open or was filled by similarly qualified applicants
> outside the protected class.
>
> ...
>
> [If the employee] present[s] a *prima facie* case, "the burden shifts
> to the employer to articulate a legitimate, nondiscriminatory reason
> for the adverse employment action."

[Id.].

Anderson has shown that as an African American she is a member of

a protected class and that she suffered an adverse employment action

when she was terminated. She has not presented a forecase of evidence,

---

[3]In the context of employment discrimination, "direct evidence" is "evidence of
conduct or statements that both reflect directly the alleged discriminatory attitude and
that bear directly on the contested employment decision." Fuller v. Phipps, 67 F.3d
1137, 1142 (4th Cir. 1995), *abrogated on other grounds*, Desert Palace, Inc. v. Costa,
539 U.S. 90 (2003).

however, that she was performing at a level that met her employer's legitimate expectations at the time she was fired. The uncontroverted record shows a persistent pattern throughout Anderson's employment of missing work and/or taking vacation without prior permission from her supervisor. As early as 2001, she was reprimanded for failing to call if she was going to be late for work and for failing to show up at all without calling. Although Anderson complains that female managers had a vendetta against her, in 2002 she wrote on her annual performance review that it was a "damn shame" she had to be judged by men. In that same year, she was disciplined for taking more vacation than she was allowed and for missing timesheets. During her deposition testimony, Anderson admitted that she lied to her supervisor about having to go to court. In addition, during meetings with her supervisors as well as during the internal recourse investigation, Anderson admitted that some of her timesheets were improperly completed. Smith v. United Parcel Service, Inc., 53 F.Supp.2d 833 (W.D.N.C. 1999) (plaintiff who admitted he was not performing his job satisfactorily could not make out a *prima facie* case). Anderson's concessions cause the record to be undisputed that she did not meet the legitimate expectations of Duke at the time she was terminated. Riley v. Northern Trust Bank, 1998 WL 155913 (N.D.Ill. 1998) (employee who

falsified timesheets did not meet the legitimate expectations of her employer); Burns v. Interparking Inc., 24 Fed.Appx. 544 (7th Cir. 2001) (employee who falsified records and acted dishonestly could not show that he met the legitimate expectations of his employer); Rizkalla v. Engineering, Management & Integration, Inc., 2006 WL 4459434 (E.D.Va. 2006) (employee who engaged in acts of financial dishonesty within the company could not show she met her employer's legitimate expectations), *affirmed* 222 Fed.Appx. 262 (4th Cir. 2007);  Wermer v. La Crosse County, 407 F.Supp.2d 1013 (W.D.Wis. 2006) (plaintiff who did not control his temper or get along with co-workers could not show that he met the legitimate expectations of his employer); Czerska v. United Airlines, Inc., 292 F.Supp.2d 1102 (N.D.Ill. 2003) (employee who improperly reported reimbursable expenses could not show she met the legitimate expectations of her employer).

The Plaintiff has failed to present a forecast of evidence that establishes a *prima facie* case of discrimination because the undisputed evidence shows that she was not adequately performing her job, and for that reason her action must fail.  In addition, Duke has established a legitimate, nondiscriminatory reason for her termination by showing that Anderson falsified timesheets.  Laber, 438 F.3d at 430-31.  "Once a plaintiff

makes this *prima facie* case, [s]he creates a presumption of discrimination and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment decision. If the defendant satisfies this burden, the presumption disappears and the plaintiff must show that the articulated reasons is a pretext for [] discrimination." [Id.].  Anderson has not brought forth any admissible evidence showing that Duke's legitimate, non-discriminatory reason is pretext for discrimination.

Anderson made general allegations of disparate treatment by claiming she was not allowed to work overtime, Thompson failed to provide a six month evaluation, other unidentified employees were punished less severely and Duke declined to purchase a new scanner for her use.  As noted above, the allegations do not qualify as admissible evidence sufficient to withstand summary judgment because the operative portions of such evidence are rank hearsay.  Assuming *arguendo* that such evidence were admissible, Anderson cannot make out a *prima facie* case of disparate treatment.  In the absence of direct evidence, a plaintiff alleging disparate treatment may attempt to satisfy the *McDonnell-Douglas* test by raising an "inference of discriminatory intent by showing that [s]he was treated worse than similarly situated employees of other races."  Sterling v. Tenet, 416

27

F.3d 338, 345 (4th Cir. 2005), *cert. den.* 546 U.S. 1093 (2006); <u>Hux v. City of Newport News</u>, 451 F.3d 311, 314-15 (4th Cir. 2006).  To make out a *prima facie* case of disparate treatment, a plaintiff must show (1) she is a member of a protected class; (2) she was qualified for the job and performed it satisfactorily; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated employees outside of the protected class. <u>Id</u>.   As stated previously, however, Anderson's evidentiary concessions prevent her from satisfying the element that she was performing her job satisfactorily.  Moreover, Anderson has produced absolutely no evidence of any other employees who falsified time records or that they were treated more favorably.  <u>Carter v. Ball</u>, 33 F.3d 450, 461 (4th Cir. 1994); <u>Smith</u>, 53 F.Supp.2d at 837 ("Plaintiff has not shown that he was disciplined more severely than white employees who admitted violating COD policies.").  "Discharging an employee who has admitted dishonesty is different from the discharge of an employee for tardiness[.]" <u>Id</u>. at 837.

Anderson's claim that she was denied a six month evaluation must rise to the level of an adverse employment action in order for her to state a disparate treatment claim.  An adverse employment action is one which alters the terms or conditions of employment.  <u>Enowmbitang v. Seagate Technology, Inc.</u>, 148 F.3d 970, 973 (8th Cir. 1998).  Thompson asserted

that all employment decisions, such as promotions and salaries, were based on the annual evaluations. [Doc. 23-8 at ¶42]. "Because the [lack of] evaluation did not change the terms or conditions of [Anderson's] employment, it was not an adverse employment action, and is therefore not actionable under Title VII." Enowmbitang, 148 F.3d at 974; *accord* James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 377 (4th Cir. 2004) ("[A] poor performance evaluation 'is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'"), *cert. den.* 543 U.S. 959 (2004). Moreover, it is uncontradicted that Anderson's supervisor, Thompson, did not provide six-month reviews for *anyone*. After all, even Anderson admitted that the company provided "*annual* performance appraisals," [Doc. 24-2 at 73], not semi-annual. Hence, there is a complete absence of discrimination in such action.

The uncontradicted evidence shows that the only time Anderson requested to work overtime was actually an attempt to make up time she took off without permission on August 10, 2005. Brockman v. Snow, 217 Fed.Appx. 201 (4th Cir. 2007) (the denial of plaintiff's request to work from home was not an adverse employment action). Furthermore, Thompson testified that she did not allow any administrative specialists to work on

weekends due to lack of management supervision. Thus, it is undisputed that Anderson was not treated differently from anyone else. Nicole v. Grafton School, Inc., 181 F.Supp.2d 475 (D.Md. 2002) (where plaintiff produced no evidence that the denial of a request to work overtime was based on her race, she did not make out a *prima facie* case).

As for the unidentified employees allegedly treated less severely, Anderson "has offered no specific proof of exactly who was treated differently and how."[4] Wang v. Metropolitan Life Ins. Co., 334 F.Supp.2d 853, 863 (D.Md. 2004). "'[V]ague claims of differing treatment' by the plaintiff are insufficient to demonstrate disparate treatment." Id.; *accord*, Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998) ("[C]onclusory statements, without specific evidentiary support, cannot support actionable claim for [disparate treatment].").

Finally, Anderson complained that she was not supplied with a separate new scanner.

> [Duke's] failure to provide [Anderson] a [scanner] does not rise above a "mere inconvenience" and therefore does not constitute an adverse employment action; whether [Duke] wishes to give its [administrative specialists] specific pieces of equipment is a business decision that is not susceptible to judicial oversight.

---

[4]To the extent that Anderson attached purported evidence to her unsigned, unsworn response, it is unauthenticated and inadmissible.

Enowmbitang, 148 F.3d at 973, *accord,* Richardson v. Richland County

School Dist., 52 Fed.Appx. 615 (4th Cir. 2002).

Even if Anderson could make out a *prima facie* case, she has failed to

come forward with any evidence that the reasons offered by Duke for its

business decisions were pretextual.  As previously noted, her case rests on

her own speculation, belief, conjecture and opinion that she was mistreated

based on race.  That is insufficient to survive summary judgment.

Plaintiff also asserts a claim that her termination from employment

was contrary to the public policy of North Carolina.  "The public policy of

North Carolina expressed in N.C.Gen.Stat. §143-422.1, *et. seq.*, is

essentially identical to the public policy articulated in Title VII."  Phillips v.

J.P. Stevens & Co., Inc., 827 F.Supp. 349, 353 (M.D.N.C. 1993).  North

Carolina state courts "look to federal decisions for guidance in establishing

evidentiary standards and principles of law to be applied in discrimination

cases."  Newberne v. Department of Crime Control and Public Safety, 359

N.C. 782, 790 n.2, 618 S.E.2d 201 (2005).  Thus, since the Plaintiff's case

does not withstand summary judgment on the Title VII claim, it will not do so

on the state claim. [Id.].  For this reason summary judgment will be granted

on this claim as well.

There remains the Plaintiff's motion to have her portion of the

31

mediation fee waived due to indigency. The Plaintiff has appeared in this action in a *pro se* capacity and at no point prior to this motion has she alleged the inability to proceed without the prepayment of fees. On December 20, 2006, Magistrate Judge Keesler filed a Pre-Trial Order and Case Management Plan directing the parties to mediation on or before September 14, 2007. On June 6, 2007, counsel for the Defendant wrote to the Plaintiff and explained that mediation would result in a fee from the mediator which was to be shared equally by the parties. The Defendant reports that mediation occurred and at no time prior to or during the mediation did the Plaintiff voice her inability to pay for her one-half of the mediator's fee. In fact, immediately prior to mediation, the mediator explained his fee and the payment structure. The Plaintiff did not object at that time, even though she appeared at the mediation with counsel. The mediator then sent his bill to the parties and the Plaintiff now seeks indigency status, but only as to this bill.

The Local Rules of the Western District of North Carolina provide that mediation shall be governed by the Rules Implementing Statewide Mediated Settlement Conferences in Superior Court Civil Actions as promulgated by the North Carolina Supreme Court pursuant to N.C.Gen.Stat. §7A-38.1. Rule 7 of those Rules provides in pertinent part:

> No party found to be indigent by the court for the purposes of these rules shall be required to pay a mediator fee. ... Any party may move the ... [court] for a finding of indigence and to be relieved of that party's obligation to pay a share of the mediator's fee. Said motion shall be heard subsequent to the ... trial of the action. In ruling upon such motions, the Judge shall apply the criteria enumerated in G.S. 1-110(a), but shall take into consideration the outcome of the action and whether a judgment was rendered in the movant's favor. The court shall enter an order granting or denying the party's request.

Rule 7(D), Rules Implementing Statewide Mediated Settlement Conferences in Superior Court Civil Actions.

The cited statute, N.C.Gen.Stat. §1-110, provides that a person seeking to proceed as an indigent must file an affidavit showing indigency and that the person meets one or more of five other criteria, such as receiving food benefits or supplemental security income. Anderson has placed nothing before the Court in support of her unsworn pronouncement that she is unable to pay her portion of the mediator's fee. Griffis v. Lazarovich, 164 N.C.App. 329, 332, 595 S.E.2d 797 (2004) ("Plaintiff's affidavit does not specify or allege that she receives one or all of these statutorily enumerated factors."). For that reason and because the Defendant is the prevailing party in this action, the motion to waive the fee will be denied.

**ORDER**

    **IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 21] is hereby **GRANTED** and Judgment shall be entered simultaneously herewith.

    **IT IS FURTHER ORDERED** that the Plaintiff's Request for Indigency [Doc. 30] is hereby **DENIED**.

Signed: October 13, 2008

Martin Reidinger
United States District Judge